IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| WILLIAM J. SEDLAK, | ) | |
| | ) | |
| Plaintiff, | ) | 8:18CV515 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| ANDREW SAUL, Commissioner of | ) | **AND ORDER** |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff William Sedlak brings this action under Titles II and XVI of the Social Security Act, which provide for judicial review of "final decisions" of the Commissioner of the Social Security Administration. 42 U.S.C. § 405(g) (Westlaw 2019).[1]

## I. NATURE OF ACTION & PRIOR PROCEEDINGS

### A. Procedural Background

Sedlak filed an application for disability benefits on January 27, 2016, under Titles II and XVI. The claims were denied initially and on reconsideration. On March 21, 2018, following a hearing, an administrative law judge ("ALJ") found that Sedlak was not disabled as defined in the Social Security Act. (Filing No. 10-2.) On August 27, 2018, the Appeals Council of the Social Security Administration denied Sedlak's request for review. (Filing No. 10-2 at CM/ECF pp. 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *Sims v. Apfel*, 530 U.S. 103,

---

[1] Plaintiff originally named Nancy A. Berryhill, Acting Commissioner of Social Security, as the Defendant in this action. Andrew Saul became the Commissioner of Social Security on June 17, 2019, and has been automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

107 (2000) ("if . . . the Council denies the request for review, the ALJ's opinion becomes the final decision").

## B.   Medical & Opinion Evidence; Sedlak's Testimony

### 1.   Medical Evidence

The material medical evidence related to Sedlak's impairments is undisputed and is described by the ALJ as follows[2]:

> The medical evidence confirms that the claimant has been diagnosed with myasthenia gravis[3] since before the alleged onset date. In January 2016, an electromyogram was performed, which confirmed median and sensory neuropathy of the left upper extremity. Specifically, the abnormal study showed electrophysiologic evidence of: proximal subacute and active motor median neuropathy; postsynaptic neuro[muscular] junction disorder; and sensory neuropathy.
>
> The medical evidence also confirms the claimant's left shoulder tendinosis.[4] Prior to the amended alleged onset date, in 2015, the claimant presented to the emergency department various times with complaints of left shoulder pain. The claimant was referred to an orthopedist, Matthew J. Teusink, MD, and in August 2015 and September 2015, Dr. Teusink observed some decreased strength with supraspinatus, but full 5/5 strength with external rotation and no pain

---

[2]The ALJ's citations to exhibit numbers have been deleted to conserve space.

[3] According to the Johns Hopkins Medicine website, "Myasthenia gravis (MG) is a chronic autoimmune disorder in which antibodies destroy the communication between nerves and muscle, resulting in weakness of the skeletal muscles. Myasthenia gravis affects the voluntary muscles of the body, especially those that control the eyes, mouth, throat and limbs." https://www.hopkinsmedicine.org/health/conditions-and-diseases/myasthenia-gravis.

[4]The ALJ uses "tendinosis" and "tendonosis" interchangeably.

with passive range of motion of the left shoulder. An MRI of the left shoulder performed August 20, 2015 indicated tendonosis of the left shoulder. The imaging revealed advanced tendinosis of the infraspinatus; advanced atrophy supraspinatus/infraspinatus; moderate to advanced tendinosis subscapularis with small distal intrasubstance tear; mild atrophy subscapularis; mild tendinosis long head biceps tendon; complex tear to anterior inferior glenoid labrum; and findings suggestive of adhesive capsulitis. The objective evidence indicates that when considered in combination with his myasthenia gravis and neuropathy, his left shoulder tendinosis impairment is severe.

During the period under review, the claimant treated for these conditions with his primary care provider, Dr. Hoeft, who he saw approximately every two to four months until June 2017. In September 2017, the claimant started treating with Tyrus S. Soares, MD, a pain specialist, who he saw three times through December 2017. The claimant also treated with a neurologist, Ezequiel A. Piccione, MD, for management of myasthenia gravis, who he saw four times from the alleged onset date through December 2017. The claimant was treated with prescribed medication, including prednisone.

. . . [O]n December 8, 2017, Dr. Piccione documented some decreased strength of the left upper extremity rated at 4+/5 and 5-/5, along with 4+/5 strength of bilateral ankle dorsi flexors. Dr. Piccione further observed normal muscle bulk and tone with no atrophy, along with normal coordination. . . .

The medical evidence additionally confirms that the claimant has a history of a right ankle fracturing requiring post an open reduction internal fixation surgery, which occurred prior to the alleged onset date. Dr. Soares assessed him with chronic ankle pain and osteoarthritis of the bilateral ankles.

. . . His treating examiners observed some edema and tenderness at times, along with decreased 4+/5 strength of the ankle dorsi flexors. In January 2016 and July 2016, Dr. Piccione did not document any abnormalities with regard to the claimant's gait. In May 2017 and December 2017, Dr. Piccione noted that the claimant was unable to walk

on tip-toes or heels bilaterally, but he was able to walk steps in tandem, to get out of a chair without pushing off, and was able to squat, and Romberg sign was absent. The medical evidence does not indicate that the claimant has been prescribed an assistive walking device, not has he been observed to be using one. . . .

The medical evidence shows that the claimant was prescribed opiate medication for this condition during the period under review. He was initially prescribed the opiates by his primary care provider, Dr. Hoeft, until September 2017, when Dr. Soares start[ed] prescribing it to him. In October 2017, the claimant reported to Dr. Soares that the opiate medication was "effective["] and that his pain symptoms were "stable." He made similar reports to Dr. Soares in December 2017 and additionally reported that his ankle pain was "generally tolerable and he is functional and mobile." . . .

. . . .

. . . [E]ven though the claimant was prescribed opiates, urine drug screen tests performed in March 2017 and June 2017 revealed negative results for opiates. . . .

The evidence of record confirms that the claimant has ptosis[5] secondary to his myasthenia gravis. Ptosis of the left eye was obvious at the hearing, and it has been documented by various medical providers. . . .

(Filing No. 10-2 at CM/ECF pp. 30-32.)

## 2.      Opinion Evidence

The ALJ gave "some weight" to the opinions of Sedlak's treating physicians,

---

[5]According to the American Academy of Ophthalmology, "Ptosis is when the upper eyelid droops over the eye. The eyelid may droop just a little, or so much that it covers the pupil . . . . Ptosis can limit or even completely block normal vision." https://www.aao.org/eye-health/diseases/what-is-ptosis.

Dr. Piccione, a neurologist, and Dr. Hoeft. Dr. Piccione's opinions are undisputed and
described by the ALJ as follows[6]:

> . . . In a letter dated August 1, 2016, Dr. Piccione stated that the
> claimant's symptoms vary day to day, making it difficult to maintain
> consistent employment. In a letter dated June 26, 2017, Dr. Piccione
> stated that the claimant's symptoms had become worse, he was having
> more diffuse muscle weakness, and he was having worsening ptosis on
> the right. He stated this made it difficult for the claimant to hold
> employment. In May 2017, Dr. Piccione opined that the claimant had
> "significant problems with walking from his car due to the myasthenia
> so will provide handicap placard." A handicapped parking pass was
> approved by Dr. Piccione on May 26, 2017. . . .
>
> Dr. Piccione provided another letter dated January 25, 2018 in which he
> stated he believed that consistent with the severity of his myasthenia
> gravis, he would be limited to standing and walking for no more than
> two hours of an eight-hour day due to his symptoms. He further opined
> the claimant would be limited to occasional use of his upper extremities
> for handling, reaching, or fingering. He becomes easily fatigued, which
> requires him to rest frequently. Due to weakness, he is unable to lift
> more than 10 pounds on an occasional basis. . . .

(Filing No. 10-2 at CM/ECF pp. 33-34.) The ALJ also described and considered Dr.
Hoeft's opinions:

> . . . In a letter dated February 27, 2017, Dr. Hoeft stated that the claimant
> is "unable to effectively work and hold down gainful employment due
> to chronic medical conditions." He stated that his history of ankle
> surgery requires opiate medications, which can affect work performance.
> Dr. Hoeft stated that given his medical problems, especially myasthenia
> gravis, he would not be able to hold down any substantial employment,
> and Dr. Hoeft opined that the claimant is "totally disabled." . . . [T]he
> claimant testified that he has not experienced side effects from the

---

[6]Again, the ALJ's multiple citations to the record have been deleted to conserve
space.

opiates, and he was previously able to work while taking them. . . .

(Filing No. 10-2 at CM/ECF p. 34.)

### 3. Sedlak's Hearing Testimony

At his hearing before the ALJ, Sedlak testified that his myasthenia gravis is "the biggest problem affecting" him and his ability to work, and this medical condition causes ptosis of his eyelids (mostly the left and sometimes the right), blurriness, and headaches from trying to force his eyes to stay open; weakness in his arms and legs; reduced strength and ability to carry things; difficulty in manipulating his hands to, for example, open a Ziploc baggie; and difficulty standing and walking such that "if somebody was walking behind me, they would probably think I was drunk." (Filing No. 10-2 at CM/ECF pp. 75-78, 82, 90.)

Sedlak testified that he was released from his past job as a delivery driver for an auto-part shop because he could no longer lift heavy parts, his "eyes were just getting so bad," his arms are weak, he struggles to "walk a distance," and his Department of Transportation medical certification was rescinded because "[w]ith the drooping of the eyelid and stuff," Sedlak "couldn't do the driving anymore." (Filing No. 10-2 at CM/ECF pp. 67-68.) Sedlak also testified that he suffers "pain all day long" due to his 2012 surgery for a broken ankle that required the insertion of a "plate and three screws" and shoulder tendinosis. (Filing No. 10-2 at CM/ECF pp. 79, 81.)

Sedlak takes hydrocodone for pain in his ankle, left arm, and left shoulder. (Filing No. 10-2 at CM/ECF p. 91.) When the ALJ questioned Sedlak about why he tested negative for opiates in March and June of 2017 when he had been prescribed hydrocodone, he "couldn't explain that one" and he "do[es]n't understand why." (Filing No. 10-2 at CM/ECF pp. 91-92.)

Due to muscle weakness from Sedlak's myasthenia gravis and his ankle pain,

it is "hard to stand for a good 15, 20 minutes at a time." (Filing No. 10-2 at CM/ECF pp. 88-89.) After standing for that length of time, Sedlak estimated he needs to sit for 45 minutes or longer before standing again. Sedlak claims he could be on his feet only two hours in an eight-hour day. (Filing No. 10-2 at CM/ECF p. 89.)

As far as daily activities, Sedlak testified that he lives with his mother and he "sometimes" cooks, keeps his own room clean, vacuums around his bed, gets groceries, and mows with a self-propelled mower with sitting breaks every two rows. (Filing No. 10-2 at CM/ECF pp. 93-94.)

## C.   The ALJ's Conclusions

Following the five-step sequential analysis[7] for determining whether an individual is "disabled" under the Social Security Act, 20 C.F.R. § 404.1520, the ALJ concluded in relevant part (Filing No. 10-2 at CM/ECF pp. 24-36):

1.   Sedlak has not engaged in substantial gainful activity since December 15, 2015, the alleged onset date.

2.   Sedlak has the following severe impairments: median motor neuropathy of the left upper extremity; myasthenia gravis; left shoulder tendonosis; and status post right ankle open reduction internal fixation. Sedlak also has impairments that are less than severe (diabetes mellitus) and non-severe (hypertension, hyperlipidemia, sleep apnea, history of ulcerative colitis, obesity, borderline intellectual functioning).

---

[7]*See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." (quotation and citation omitted)).

3.     Sedlak does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.     Sedlak has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a), but with additional limitations. Specifically:

> He can perform no overhead reaching with the left upper extremity and occasional reaching in other directions with the left upper extremity. He can perform frequent but not constant handling, fingering, and feeling bilaterally. He can perform no climbing of ladders, ropes or scaffolds, and he can occasional [sic] climb ramps and stairs. He can occasionally balance, stoop, kneel, and crawl, but he can never crawl.[8] He can have no exposure to moving mechanical parts, unprotected heights, or operating a motor vehicle. He is unable to read small print in 10-point font or smaller. He cannot perform jobs that require a regular use of depth perception.

(Filing No. 10-2 at CM/ECF p. 29.)

5.     Sedlak is unable to perform any past relevant work of a delivery driver and general laborer as actually or generally performed.

6.     Sedlak was born on March 12, 1971, and was 44 years old on the alleged disability-onset date, making him a younger individual under the Code of Federal Regulations. Sedlak has at least a high school education and is able to communicate in English. Transferability of job skills is not an issue in this case because Sedlak's past relevant work is unskilled.

---

[8]The ALJ's RFC erroneously included both "occasional" and "never" crawling. I assume the reference to occasional crawling is incorrect since the ALJ's question to the vocational expert at the hearing included "occasional balance, stoop, kneel, crouch; never crawl." (Filing No. 10-2 at CM/ECF p. 101.)

7.     Considering Sedlak's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Sedlak can perform, such as a document preparer, call-out operator, and polisher of eye frames.

8.     Sedlak was not under a disability, as defined in the Social Security Act, from December 15, 2015, through the date of the ALJ's decision.

## D.     Issues on Appeal

Plaintiff argues that (1) the ALJ erred in failing to classify Sedlak's cognitive impairment as severe; (2) the ALJ erred in failing to provide good reasons for the weight afforded to the opinions of treating physicians Dr. Piccione and Dr. Hoeft and Plaintiff Sedlak's subjective report of his limitations; and (3) the ALJ was an "inferior officer not appointed in a constitutional manner." (Filing No. 14 at CM/ECF p. 20.)

## II.  STANDARD OF REVIEW

The court may reverse the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *See Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018); 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In determining whether evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. If substantial evidence supports the Commissioner's conclusion, the court may not reverse merely because substantial evidence also supports the contrary outcome and even if the court would have reached a different conclusion. *Nash*, 907 F.3d at 1089. The Eighth Circuit has repeatedly held that a court should "'defer heavily to the findings and conclusions of the Social Security Administration.'" *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010)). In other words, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff*, 421 F.3d at 789.

## III. DISCUSSION

### A.    Failure to Classify Cognitive Impairment as Severe

Sedlak contends that the ALJ erred in classifying as "non-severe" his cognitive impairment—whether such impairment is "classified as a learning disorder or borderline intellectual functioning." (Filing No. 14 at CM/ECF p. 19.) Specifically, Sedlak argues that the ALJ "failed to provide sufficient weight to Mr. Sedlak's lifelong difficulties with learning and understanding tasks" and his "difficulty with listening memory and reading comprehension." (*Id.*) Sedlak claims that the ALJ did not pay enough attention to Sedlak's childhood education records and his hearing testimony that he is "not very computer smart"[9] because two out of the three jobs the

---

[9]Regarding computer use, Sedlak testified as follows in response to the ALJ's questioning:

Q      Okay. So do you use a computer?

ALJ identified that Sedlak could perform (document preparer[10] and call-out operator[11])

_____

A    No.

Q    That because of your hands, because of your eyes, because you don't know how?

A    More of just to be able to see it and, you know, use the keypads. I'm not very computer smart, let's say. I've been in learning disability classes my whole life, where I couldn't read or spell that well at all. I still can't. So, I did the jobs I knew I could do as—you know, driving, warehouse, stuff like that that—you know, sewer cleaning—

. . . .

A    And just, you know, like trying to learn things on the computer and stuff like that, there's no—I don't comprehend a lot of it . . . .

(Filing No. 10-2 at CM/ECF pp. 82-83.)

[10]The Dictionary of Occupational Titles describes the document-preparer job (DOT 249.587-018) as:

> Prepares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices: Cuts documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor knife. Reproduces document pages as necessary to improve clarity or to reduce one or more pages into single page of standard microfilming size, using photocopying machine. Stamps standard symbols on pages or inserts instruction cards between pages of material to notify MICROFILM-CAMERA OPERATOR (business ser.) 976.682-022 of special handling, such as manual repositioning, during microfilming. Prepares cover sheet and document folder for material and index card for company files indicating information, such as firm name and address, product category, and index code, to identify material. Inserts material to be filmed in document folder and files folder for processing according to index code and filming priority schedule.

[11]The Dictionary of Occupational Titles describes the call-out-operator job (DOT 237.367-014) as:

"presumably require computers." (Filing No. 14 at CM/ECF p. 20.)

Step two of the Commissioner's five-step evaluation to determine if a claimant is disabled states that a claimant is not disabled if his impairments are not "severe." 20 C.F.R. § 416.920(a)(4).

> An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. It is the claimant's burden to establish that his impairment or combination of impairments are severe. Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing.

*Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007) (internal citations omitted).

A severe mental impairment must "significantly" limit the claimant's "mental ability to do basic work activities," 20 C.F.R. § 416.920(c), such as understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 416.922(b)(1)-(6).

"Some of the factors an ALJ may consider when determining a claimant's mental impairments are (1) the claimant's failure to allege mental impairments in his

---

Compiles credit information, such as status of credit accounts, personal references, and bank accounts to fulfill subscribers' requests, using telephone. Copies information onto form to update information for credit record on file, or for computer input. Telephones subscriber to relay requested information or submits data obtained for typewritten report to subscriber.

complaint, (2) failure to seek mental treatment, (3) the claimant's own statements, and (4) lack of medical evidence indicating mental impairment." *Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011) (mental impairment was not disabling when claimant did not allege impairment on application for benefits, claimant did not seek professional help for impairment, claimant did not report to physician history of mental or emotional problems that interfered with work, and doctors' reports mentioned no, or mild, symptoms).

In applying for Social Security benefits and in his Complaint in this court, Sedlak did not allege a learning disorder or borderline intellectual functioning as an illness, injury, or condition that caused his inability to work. (Filing No. 10-5 at CM/ECF p. 3 (1/27/16 application for benefits); Filing No. 1 (Complaint).) In an extensive discussion of Sedlak's alleged mental impairment, the ALJ noted that the last report evidencing a learning disability was from 1971 when Sedlak was in the ninth grade. (Filing No. 10-11 at CM/ECF pp. 57-58.) The ALJ correctly noted that this was years before Sedlak's alleged onset date; the medical evidence did not indicate that Sedlak has been diagnosed with a mental impairment or received treatment for any such impairment; and there were no medical source opinions indicating that Sedlak has mental limitations due to a mental impairment. Further, the ALJ pointed out that Sedlak worked for many years as a sewer cleaner and delivery driver despite an alleged mental impairment, and Sedlak testified that he had no trouble understanding or performing his duties at those prior jobs, nor has he "had any problems . . . adapting to life in the real world because of learning problems." (Filing No. 10-2 at CM/ECF p. 86.)

Under these circumstances, Sedlak failed to meet his burden to prove that a learning disorder or borderline intellectual functioning significantly limits his mental ability to do basic work activities, and the ALJ properly characterized this alleged

mental impairment as non-severe.[12] *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007) (claimant bears burden of showing impairment is severe, *i.e.*, that it has more than minimal effect on his ability to work); *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007) ("A diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence."); *Dodson v. Chater*, 101 F.3d 533, 534 (8th Cir. 1996) (ALJ properly considered evidence showing plaintiff worked with same impairments she alleged made her disabled); *Thomas v. Berryhill*, 698 F. App'x 323, 324 (8th Cir. 2017) (unpublished) (ALJ was correct in not characterizing claimant's depression as severe when record did not indicate that depression symptoms interfered with basic work activities, and when claimant's account of day-to-day activities did not support more than minimal impact on ability to work).

## B. Failure to Give Proper Weight to Treating Physicians' Opinions & Plaintiff's Subjective Report of Limitations

Sedlak next argues that the ALJ did not give proper weight to certain opinions of his treating physicians and to Sedlak's own opinions regarding his limitations.

### 1. Treating Physicians' Opinions

An ALJ will give a treating physician's opinion controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence. *Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013); *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "[A]n ALJ may discount or even disregard the opinion

---

[12]As an aside, I note that neither the document-preparer nor call-out-operator jobs—as described in the Dictionary of Occupational Titles and quoted in the two footnotes immediately preceding this footnote—state that the person filling those jobs would actually operate a computer.

of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (internal quotation marks and citation omitted). The ALJ is free to reject the opinion of any physician when it is unsupported in the physician's own treatment notes or other evidence of record. *Myers*, 721 F.3d at 525; *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).

An ALJ should weigh treating-physician opinions using factors such as the nature and extent of treatment; the degree to which relevant evidence supports the physician's opinion; consistency between the opinion and the record as a whole; whether the physician is a specialist in the area in which the opinion is based; and other factors that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "Whether granting 'a treating physician's opinion substantial or little weight,' *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000), the commissioner must 'always give good reasons . . . for the weight' she gives." *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (citation omitted); 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.").

### a. Dr. Piccione

The ALJ described Dr. Piccione's opinions dated August 1, 2016[13]; June 26, 2017[14]; May 2017[15]; and January 25, 2018[16], and concluded that those opinions were

---

[13]The ALJ described Dr. Piccione's opinion on this date as follows: "the claimant's symptoms vary from day to day, making it difficult to maintain consistent employment." (Filing No. 10-2 at CM/ECF p. 33.)

[14]The ALJ described Dr. Piccione's opinion on this date as follows: "the claimant's symptoms had become worse, he was having more diffuse muscle

worthy of "some weight" as to Sedlak's "significant limitations," but were "not accepted to the extent that he asserted" because Sedlak's "extreme limitations are not supported by the objective findings, *as explained above*." (Filing No. 10-2 at CM/ECF p. 34 (emphasis added).) While the ALJ's opinion regarding the weight to be given to Dr. Piccione's opinions is certainly not a model of clarity, the ALJ does refer to an "above" explanation for why the medical evidence did not support "extreme limitations." The ALJ appears to have been referring to his citation and discussion of medical evidence from Dr. Piccione's records that did not support disabling weakness and the inability to walk. As to Sedlak's alleged disabling weakness, the ALJ found:

> To be sure, examinations that [sic] revealed left-sided weakness, albeit not to the extent now alleged. For example, on December 8, 2017, Dr. Piccione documented some decreased strength of the left upper extremity rated at 4+/5 and 5-/5, along with 4+/5 strength of bilateral ankle dorsi flexors. Dr. Piccione further observed normal muscle bulk and tone with no atrophy, along with normal coordination.

(Filing No. 10-2 at CM/ECF p. 31 (citations omitted).) As to Sedlak's purported inability to walk, the ALJ again cited Dr. Piccione's medical records:

_____

weakness, and he was having worsening ptosis on the right. He states this made it difficult for the claimant to hold employment." (Filing No. 10-2 at CM/ECF p. 33.)

[15]The ALJ described Dr. Piccione's opinion on this date as follows: "the claimant had 'significant problems with walking from his car due to the myasthenia so will provide handicap placard.'" (Filing No. 10-2 at CM/ECF p. 34.)

[16]The ALJ described Dr. Piccione's opinion on this date as "consistent with the severity of his myasthenia gravis, [the claimant] would be limited to standing and walking for no more than two hours of an eight-hour day due to his symptoms. . . . the claimant would be limited to occasional use of his upper extremities for handling, reaching, or fingering. He becomes easily fatigued, which requires him to rest frequently. Due to weakness, he is unable to lift more than 10 pounds on an occasional basis." (Filing No. 10-2 at CM/ECF p. 34.)

His treating examiners observed some edema and tenderness at times, along with decreased 4+/5 strength of the ankle dorsi flexors. In January 2016 and July 2016, Dr. Piccione did not document any abnormalities with regard to the claimant's gait. In May 2017 and December 2017, Dr. Piccione noted that the claimant was unable to walk on tip-toes or heels bilaterally, but he was able to walk steps in tandem, to get out of a chair without pushing off, and was able to squat, and Romberg sign was absent. The medical evidence does not indicate that the claimant has been prescribed an assistive walking device, nor has he been observed to be using one.

(Filing No. 10-2 at CM/ECF p. 31 (citations omitted).)

It is evident the ALJ decided what weight to assign Dr. Piccione's opinions regarding disabling weakness and the inability to walk only after considering and citing the doctor's treatment notes and medical-source statements, thereafter accepting the opinions that were supported by the objective medical evidence and rejecting those that contradicted his own treatment notes, which referred to Plaintiff as having normal muscle tone, strength, and coordination. As stated above, an ALJ is free to reject the opinion of any physician when it is unsupported by the physician's own treatment notes, and where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. *Myers*, 721 F.3d at 525; *Travis*, 477 F.3d at 1041; *Hacker*, 459 F.3d at 937; *Wildman*, 596 F.3d at 964.

Despite the fact that the ALJ properly explained why he disregarded Dr. Piccione's opinions as to Sedlak's alleged disabling weakness and inability to walk, the ALJ did err[17] in not explaining why he rejected Dr. Piccione's opinion that Sedlak

_____

[17]Sedlak does not directly raise this issue; however, I am entitled to raise it *sua sponte. Taylor v. Astrue*, No. CIV. 6:08-CV-06082, 2009 WL 3571363, at *4 & n.3 (W.D. Ark. Oct. 26, 2009) (reversing and remanding denial of benefits due to ALJ's failure to evaluate alleged disability under both child and adult disability standards, which was issue not raised by plaintiff, but considered by the court *sua sponte*); *Rector v. Astrue*, No. 5:07-CV-05130, 2008 WL 4145664, at *3 & n.3 (W.D. Ark.

was limited to "*occasional* use of his upper extremities for handling, reaching or fingering." (Filing No. 10-2 at CM/ECF p. 34; Filing No. 10-12 at CM/ECF p. 3.) The ALJ explicitly found that Dr. Piccione's opinion in this regard was "generally consistent with the other evidence of record," yet the ALJ formulated an RFC that permitted Sedlak to "perform *frequent* but not constant handling, fingering, and feeling bilaterally." (Filing No. 10-2 at CM/ECF p. 29.) The difference between "occasional" and "frequent" is critical in this case because the vocational expert at the administrative hearing opined that if an individual with Sedlak's limitations was only allowed to "occasionally" handle, finger, and feel, there would be no jobs available in the national economy at the sedentary, unskilled level—which would mean Sedlak would be classified as disabled. (Filing No. 10-2 at CM/ECF p. 103.) 20 C.F.R. § 404.1566(b) ("If work that you can do does not exist in the national economy, we will determine that you are disabled.").

While the ALJ may well have had an adequate medical basis on which to find that Sedlak had the ability to "frequently" handle, finger, and feel, he failed to identify and discuss such evidence, which he was bound to do. *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) ("Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. The ALJ may not simply draw his own inferences about plaintiff's functional ability from medical reports." (internal quotation marks and citations omitted)); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (because formulation of one's RFC is a medical question, "some medical evidence must support the determination of the claimant's RFC . . . ." (internal quotation marks, alteration, and citations omitted)).

Therefore, this matter must be remanded for analysis of Sedlak's ability to

Sept. 4, 2008) (unpublished) (recommending reversal and remand based on ALJ's improper application of the Grids, deciding that although plaintiff did not raise that issue, "this Court may raise this issue *sua sponte*").

perform "frequent" handling, fingering, and feeling, including citation to, and discussion of, supporting medical evidence. Such discussion should include the ALJ's reason for disregarding Dr. Piccione's opinion that Sedlak is limited to "occasional" handling, fingering, and feeling in light of the ALJ's conclusion that such opinion "is generally consistent with the other evidence of record." (Filing No. 10-2 at CM/ECF p. 34.)

    **b.**    **Dr. Hoeft**

The ALJ described Dr. Hoeft's opinions that Sedlak would be unable to hold gainful and substantial employment due to his medical conditions; that Sedlak's opiate medications for his ankle pain could affect work performance; and that Sedlak is totally disabled. (Filing No. 10-2 at CM/ECF p. 34.) The ALJ properly explained his reason for rejecting Dr. Hoeft's opinions about total disability and Sedlak's inability to work because such findings are reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]" (internal quotation marks and citation omitted)). The ALJ also properly disregarded Dr. Hoeft's opinion that Sedlak's opiate medications would affect his work performance because Sedlak testified that he has not experienced side effects from the opiates. (Filing No. 10-2 at CM/ECF p. 91.)

The ALJ then stated, with no further discussion or detail, "To the extent Dr. Hoeft opined the claimant would have serious limitations, his opinion is given some weight; however, the extent of the asserted limitations is not supported by the objective findings of record." (Filing No. 10-2 at CM/ECF p. 34.) Sedlak argues that "[t]he ALJ's failure to cite what objective findings did not support Dr. Hoeft's opinions did not constitute a good reason for rejecting Dr. Hoeft's opinions concerning the severity of Mr. Sedlak's impairments." (Filing No. 10-2 at CM/ECF

p. 17.) While it is true the ALJ must give good reasons, supported by substantial evidence, for assigning a certain weight to medical opinions, Sedlak fails to identify or describe any further opinions of Dr. Hoeft (other than the opinions discussed immediately above) that are at issue, making it impossible for the court to analyze this argument further.

Nor does Sedlak offer any discussion, analysis, or rationale beyond his stated broad proposition of law that an ALJ must give good reasons for assigning a particular weight to a physician's opinion. Therefore, Sedlak has waived any further argument related to Dr. Hoeft's unidentified opinions. *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (rejecting claimant's "listing" argument because "[the claimant] provides no analysis of the relevant law or facts regarding these listings"); *see also Aulston v. Astrue*, 277 F. App'x 663, 664 (8th Cir. 2008) (unpublished) (declining to consider social-security claimant's "undeveloped" argument and considering such argument waived); *Michael S. v. Berryhill*, No. 17-CV-5586, 2019 WL 1430138, at *9 (D. Minn. Mar. 29, 2019) (when social-security claimant did not give reason for assertion that ALJ improperly assessed consultants' opinions, court would not consider argument because "[u]ndeveloped arguments such as this are waived").

## 2. Plaintiff's Subjective Report of Limitations

Sedlak next argues that the ALJ failed to give sufficient weight to his subjective report of his limitations. The ALJ found that Sedlak's "compaints of disabling symptoms [were] not fully supported by the record," and the only limitations supported by the record were those appearing in the ALJ's RFC. (Filing No. 10-2 at CM/ECF p. 33.) In support of his opinion that Sedlak's subjective complaints were not credible, the ALJ pointed to Sedlak's ability to do household chores, mow the lawn, care for his day-to-day needs, and read printed material on a box of Hamburger Helper and in text messages on his cellular telephone. The ALJ also found no reason for Sedlak to have stopped working after his Department of Transportation medical certification to drive was rescinded because "[t]he evidence of record does not support

a finding that his condition significantly worsened at the time he lost of [sic] job"; "his testimony at the hearing did not clarify why he had been able to work with his conditions and then subsequently alleged that he could not"; Dr. Piccione's description of Sedlak's weakness in recent examinations "do not suggest difficulties to the extent now alleged"; and "it is not clear that the claimant stopped working at the time of the alleged onset date due to any disabling impairments." (Filing No. 10-2 at CM/ECF pp. 32-33.)

Sedlak complains that his condition was worse at the time of the hearing—February 12, 2018—than what was reflected in the doctors' notes referenced in the ALJ's opinion, and that his condition "had to be compared against the most recent notes, not the earlier notes." (Filing No. 10-2 at CM/ECF p. 17.) Specifically, Sedlak argues that the ALJ should have considered Dr. Piccione's December 8, 2017, treatment note, which most closely reflected Sedlak's condition at the hearing. The treatment note to which Sedlak refers is Exhibit 18F, which was referenced by the ALJ at least 13 times. Clearly, the ALJ considered the most recent treatment notes available.

Sedlak next asserts that the ALJ erred in "fail[ing] to notice that Mr. Sedlak's ptosis, while originally impacting his left eye, eventually worsened to the point it affected both eyes, as evidenced by the examination findings of Dr. Piccione." (Filing No. 10-2 at CM/ECF p. 18.) Sedlak argues the ALJ's RFC is incorrect because it "only accounts for one eye being impacted with the requirement that Mr. Sedlak not be required to regularly use depth perception." (*Id*.) Sedlak claims that by the time of the hearing, both of his eyes would have been partially closed during parts of the workday, and the RFC should have been adjusted accordingly.

As it concerns Sedlak's eyesight, the ALJ's RFC states, "He is unable to read small print in 10-point font or smaller. He cannot perform jobs that require a regular use of depth perception." (Filing No. 10-2 at CM/ECF p. 29.) Again, the ALJ considered Dr. Piccione's December 2017 treatment note—issued only two months

prior to the hearing—which stated: "Currently he has left ptosis which seems to fluctuate."; "Vision is worse at night time. He cannot read well and also cannot drive at night. Denies worse drooping or double vision."; "bilateral ptosis that worsens with prolonged upgaze right more than left. Lateral gaze palsy, bilateral"; "Funduscopic normal discs/vessels"[18]; "Visual field full"; "Extraocular movements full without nystagmus[19]"; "He has difficulty with eye opening and worsening and [sic] nighttime which I suspect is all due to the myasthenia." (Filing No. 10-11 at CM/ECF pp. 39-48.)

Dr. Piccione's December 2017 report indicates that Sedlak has "fluctuating" ptosis that is worse at night, normal interior discs and vessels of the eyeball, a full visual field, full extraocular movements, and that Sedlak denied that his ptosis was getting worse or that he experienced double vision. Further, the ALJ specifically questioned Sedlak during the hearing about his eyesight, and he admitted he could read relatively small type on a packaged-food label and on a cellular telephone. Thus, the ALJ's RFC regarding Sedlak's eyesight is consistent with the evidence. *See Nash*, 907 F.3d at 1090 ("This court will not substitute its opinion for the ALJ's, who is in a better position to gauge credibility and resolve conflicts in evidence." (citation omitted)); *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC.").

---

[18]The fundus of the eyeball is "the portion of the interior of the eyeball around the posterior pole, visible through the ophthalmoscope." *Stedmans Medical Dictionary* 357210 (Westlaw 2019).

[19]Nystagmus is "[i]nvoluntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component." *Stedmans Medical Dictionary* 619540 (Westlaw 2019).

**C.**     **ALJ Not Properly and Constitutionally Appointed**

Because this matter will be remanded for reconsideration, it is unnecessary to discuss Sedlak's argument that the ALJ "was an inferior officer not appointed in a constitutional manner" pursuant to the Appointments Clause of the United States Constitution. *See* U.S. Const. art. 2, § 2, cl. 2. (Filing No. 14 at CM/ECF p. 20; Filing No. 18 at CM/ECF p. 3.) *See, e.g.*, *Smith v. Saul*, No. 8:18-CV-240, 2019 WL 2905671, at *8 (D. Neb. July 5, 2019) ("On remand, Smith may raise a challenge to the ALJ's appointment if she so elects. It will be up to the Commissioner whether to have the previous ALJ preside, or whether it would be prudent to assign a different ALJ and avoid any later challenge that may arise . . . ."); *Schmitz v. Berryhill*, No. 4:18CV3074, 2019 WL 1331724, at *17 (D. Neb. Mar. 25, 2019) (finding it unnecessary to discuss plaintiff's constitutional challenge to ALJ's authority to adjudicate her claim or Commissioner's waiver argument because case would be remanded for reconsideration of step-three errors); *Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL 6421725, at *8 (D. Neb. Dec. 6, 2018) (claimant could reassert Appointments Clause claim on remand, and Commissioner could decide whether to assign different ALJ to the case).[20]

## IV. CONCLUSION

For the reasons discussed above, the ALJ's decision was not supported by substantial evidence on the record as a whole and must be remanded for analysis of Sedlak's ability to perform "frequent" handling, fingering, and feeling, including citation to, and discussion of, supporting medical evidence. Such discussion should

---

[20]The same attorney who appears for the claimant in this case has appealed several cases (which have been consolidated) raising the issue of whether various Social Security ALJs were inferior officers that were unconstitutionally appointed under the Appointments Clause. *See Davis, Thurman, Iwan v. Commissioner of Social Security*, Nos. 18-3422, 18-3451, 18-3452 (8th Cir. 2018). These appeals have not yet been resolved.

include the ALJ's reason for disregarding Dr. Piccione's opinion that Sedlak is limited to "occasional" handling, fingering, and feeling in light of the ALJ's conclusion that Dr. Piccione's opinion was "generally consistent with the other evidence of record." (Filing No. 10-2 at CM/ECF p. 34.) Accordingly,

IT IS ORDERED:

1.     The Clerk of the Court is directed to substitute Commissioner of Social Security Andrew Saul as the Defendant.

2.     Plaintiff's Motion for an Order Reversing the Commissioner's Decision (Filing No. 13) is granted.

3.     Defendant's Motion to Affirm Commissioner's Decision (Filing No. 15) is denied.

4.     The Commissioner's decision is reversed pursuant to sentence four of 42 U.S.C. § 405(g), and the case is remanded for further proceedings consistent with the foregoing opinion.

5.     Judgment will be entered by separate document.

DATED this 8th day of August, 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge
